IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| THOMAS J. PORCELLI, | : |
| Plaintiff, | : |
| v. | : Civil Action No. 11-546-RGA |
| MICHAEL J. ASTRUE,<br>Commissioner of Social Security, | : |
| Defendant. | : |

## MEMORANDUM OPINION

Thomas J. Porcelli, Wilmington, Delaware. Pro se Plaintiff.

Charles M. Oberly III, United States Attorney, Wilmington, Delaware and Patricia A. Stewart, Special Assistant United States Attorney, Philadelphia, Pennsylvania. Counsel for Defendant.

Dated: November 30, 2012
Wilmington, Delaware

ANDREWS, UNITED STATES DISTRICT JUDGE:

Plaintiff Thomas J. Porcelli appeals denial of his application for disability insurance benefits ("DIB") under Title II of the Social Security Act (the "Act"). Jurisdiction exists pursuant to 42 U.S.C. § 405(g).

Pending before the Court are cross-motions for summary judgment filed by Porcelli and Michael J. Astrue, Commissioner of Social Security. For the reasons set forth below, the Court denies Porcelli's motion for summary judgment and grants the Commissioner's motion for summary judgment.

## I. Procedural History

Porcelli filed an application for DIB on October 26, 2007, alleging disability due to lower back spondylosis, chronic tinnitus, and depression with an onset date of January 1, 2002. (D.I. 11, transcript at 99, 130, 134.) The claim was denied initially and upon reconsideration. (*Id.* at 53-54.) Thereafter, Porcelli requested a hearing which took place before an administrative law judge ("ALJ") on August 6, 2009. Counsel represented Porcelli at the hearing, and Porcelli and a vocational expert ("VE") testified. (*Id.* at 19-52.) The ALJ found that Porcelli met the insured status requirements of the Act through June 30, 2006, and that Porcelli was not disabled. (*Id.* at 9-18.) Porcelli sought review by the Appeals Council, but it denied his request for review and, therefore, the ALJ's decision became the final agency decision subject to judicial review. (*Id.* at 1.) On June 20, 2011, Porcelli, proceeding *pro se*, filed the current action for review of the final decision. (D.I. 1.)

## II. Background

Porcelli was born on October 24, 1956, and is a college graduate. (*Id.* at 27-29.) He has past relevant work as an automobile assembler and a caretaker. (*Id.* at 28-29.) Porcelli ceased

employment in the automobile industry in 2000 to become his mother's caretaker, a position he held until her death in 2002. (*Id.* at 29.) Porcelli has not been gainfully employed since that time.

## III. Medical Evidence

Porcelli did not work at Chrysler from February 17, 1999 to August 22, 2000 due to chronic low back pain and chronic tinnitus. (*Id.* at 186, 195.) Dr. Andrew Nash, Porcelli's primary physician, treated him for the back condition. (*Id.* at 32.)

Medical records dated November 3, 1997, note a history of chronic back pain. (*Id.* at 207.) In addition, Porcelli sustained a work-related back injury in April 1998. (*Id.* at 203.) Porcelli received treatment for his back condition in July and August 3, 1998. An August 3, 1998 x-ray revealed mild osteophyte formation, mild curvature of the spine with convexity to the right, and mild disc space narrowing at L4-5 and L5-S2. (*Id.* at 210.) An MRI performed August 8, 1998, revealed evidence of mild lumbar spondylosis with multilevel extradural defects including a small left-sided disc protrusion at the L1-L2 level with slight flattening of the ventral thecal sac. (*Id.* at 210.) As of November 5, 1998, Porcelli continued with low back pain, chronic in nature. (*Id.* at 203.) He was prescribed physical therapy and Flexeril. (*Id.*)

Porcelli presented to Dr. Mark A. Glassner on May 25, 2000, with complaints of back pain in the lumber area. (*Id.* at 195.) Physical therapy was prescribed. (*Id.* at 195.) On September 28, 2001, Porcelli presented to Dr. Nash and, upon musculoskeletal examination, Porcelli's range of motion and gait were normal. (*Id.* at 344.) He had some stiffness in his lower lumbosacral spine with paravertebral muscle tightness, but there were no tender areas. (*Id.*) Dr.

2

Nash diagnosed chronic lumbosacral strain and advised Porcelli to continue with his medications and do home exercises. (*Id.* at 345.) Porcelli had some back pain in October 2001. (*Id.* at 346.)

He continued with complaints of back pain in January 2002. (*Id.* at 342.) Porcelli presented to Dr. Nash on May 3, June 14, September 7, October 25, November 8, and December 9, 2002, and on January 28, March 5, and June 3, 2003. (*Id.* at 253, 255-261.) On June 14, 2002, Dr. Nash signed a medical clearance form to allow Porcelli to join an exercise program at a health club. (*Id.* at 341.) On the form, Dr. Nash checked the box "no contraindications for participation in general exercise program." (*Id.*) Dr. Nash reported on October 24, 2003, that Porcelli's lumbar sprain was stable and, upon examination, he had normal range of motion and gait. (*Id.* at 337, 339.) Dr. Nash next saw Porcelli in November and December 2005 with complaints of a pulled back muscle and back pain. (*Id.* at 251.)

When Dr. Nash saw Porcelli on September 18, 2006, the diagnoses were low back pain and lumbar sprain, and Dr. Nash prescribed pain medication, anti-inflammatory medication and skeletal muscle relaxants, with no aggravating activity, no heavy lifting, no prolonged sitting or standing. (*Id.* at 249-250.) Dr. Nash described Porcelli's health status as lumbar sprain, manic-depressive psychosis, unspecified, depressive disorder, not otherwise specified, and generalized anxiety disorder - all stable. (*Id.* at 248.)

Dr. Nash referred Porcelli to Dr. Emmanuel Devotta for the lower back pain condition. (*Id.* at 274.) Dr. Devotto evaluated Porcelli on March 28, 2007 and diagnosed lumbar radiculopathy and lumbar facet joint syndrome. (*Id.* at 271-72.) There was tenderness at L4-S1, straight leg raise testing at 60 degrees bilateral, reflexes of the knee and ankle jerk were +2 bilateral, and there was no motor or sensory deficit. (*Id.* at 271.) An April 4, 2007 MRI revealed

3

lumbar spondylosis and facet arthropathy, disc protrusion or spinal stenosis not seen, and a subtle grade 1 reverse spondylosis at L5-S1. (*Id.* at 230.)

Dr. Devotta reported on May 2, 2007, that Porcelli had some relief from pain as a result of a bilateral lumbar facet joint block that was administered on April 17, 2007. (*Id.* at 265, 267.) The pain was reduced from six or seven to four. (*Id.* at 265.) A November 5, 2007 report provides a diagnosis of bilateral lumbar facet joint syndrome with a treatment plan to continue medical management. (*Id.* at 262.)

In 2008, two state agency physicians, Drs. N. Britman and M. H. Borek, reviewed Porcelli's medical records and found insufficient evidence to determine that Porcelli had a medically determinable physical impairment prior to his date last insured. (*Id.* at 319, 331.)

Medical records indicate that Porcelli was diagnosed in March 1990 with bipolar disorder and depression. (*Id.* at 304.) He was hospitalized at St. Francis Psychiatric in January 1997 and treated by Dr. Villaforte. (*Id.* at 207.) As of May 15, 1997, Porcelli was no longer seeing Dr. Villaforte, but attended a regular counseling group at a mental health clinic. (*Id.* at 204.) Laboratory results indicate that, as of January 3, 2000, Porcelli was treated for bipolar disorder with lithium therapy and, as of August 2000, he was seeing Dr. Vergara for psychiatric medication. (*Id.* at 191, 195.) On January 18, 2001, Porcelli was referred to mental health services for anxiety. (*Id.* at 196.)

Mental health records from the New Castle Community Mental Health Center refer to Porcelli's diagnoses of bipolar disorder and depression. As of February 4, 2003, Porcelli was compliant with medications and doing fairly well. (*Id.* at 279.) He was next seen on September 14, 2004. (*Id.* at 278.) A psychiatric reevaluation dated August 16, 2005 noted Porcelli's

4

diagnoses of bipolar disorder and depression and that he was stable and functional but gets depressed. (*Id.* at 277.) It noted that Porcelli had been hospitalized five times with mania, but did not provide the dates. (*Id.*)

Porcelli received fairly regular mental health treatment in 2006, and records indicate that throughout 2006 he was stable and compliant with medications but had some complaints of depression. (*Id.* at 298-299, 302-303.) Porcelli reported in 2006 that he was working on motorcycles, tending to his garden, and considering a part-time job. (*Id.* at 296, 298.) A December 14, 2006 psychiatric evaluation indicated that Porcelli was stable, did not experience any significant depression or anxiety, was coping well, managing his own affairs, living independently, and compliant with medication. (*Id.* at 276.)

Porcelli continued with mental health treatment in 2007, was stable throughout, and compliant with medications. (*Id.* at 283, 285, 287-88.) When Porcelli was seen on November 13, 2007, he was doing well, and was calm and cooperative. (*Id.* at 280-81.) Two state agency psychologists, C. King, Psy.D., and C. Tucker-Okine, Ph.D., reviewed Porcelli's mental health treatment records in 2008, and each found that Plaintiff did not have a "severe" mental impairment or functional limitations during the relevant time period. (*Id.* at 305-318, 320-331.)

Records indicate that Porcelli has suffered from tinnitus since at least February 26, 1998. (*Id.* at 206.) In January 1999, a physician noted that Porcelli used bilateral hearing aids and that his ears showed evidence of chronic scarring of both ear drums. (*Id.* at 203.) He gave Porcelli a note to move into a quieter work situation. (*Id.*) Porcelli underwent diagnostic studies for right sided tinnitus in April 2000. (*Id.* at 208, 234.) Porcelli also received treatment for plantar

5

fascitis. (*Id.* at 212.) He uses an orthotic for the condition and is prescribed Relafen. (*Id.* at 203.)

## IV. Administrative Hearing

### A. Porcelli's testimony

Porcelli was 52 at the time of the hearing. (*Id.* at 27.) He was born with nerve deafness and wears hearing aids. (*Id.* at 35.) He is right-handed and is missing his left index finger as a result of a childhood accident, but he has no problems using his right hand . (*Id.* at 37-39.) Porcelli has a driver's license, is able to drive, and can ride a scooter. (*Id.* at 27-28, 45.)

Porcelli testified that, from 2002 to 2006, his biggest health problem was his "fourth and fifth discs, the lumbar." (*Id.* at 31.) He has lived with the back problem since 1980. (*Id.* at 32.) Porcelli had no surgery, but went to a physical therapy facility for a long time and took pain medication and muscle relaxants. (*Id.* at 32.) The physical therapy did not provide relief. (*Id.*)

Porcelli testified that he became unable to work in early 2000. (*Id.* at 29.) He was employed by Chrysler as a technician in the 1990's until 1999 where he performed assembly line work. The position required standing, walking, and light lifting. (*Id.* at 29.) Because of his deafness, Porcelli worked in an area that was not too noisy. (*Id.* at 36.) Porcelli stopped working at Chrysler due to his back condition, plantar fascitis, and tinnitus. (*Id.* at 33-34.) He had pain, spasms, and mobility problems. (*Id.* 33-34.) The pain varied, at times lasted all day, and depended upon the weather. (*Id.* at 33) Medication helped with the pain. (*Id.*) Porcelli took medication to treat the tinnitus, which helped. (*Id.* at 37.) In addition he received orthotics for his plantar fascitis. (*Id.*)

Following his employment at Chrysler, Porcelli was employed as his mother's caretaker from 2000 until her death in 2002. (*Id.* at 30, 37.) His duties included helping her get around, cooking meals, taking her to the physician, and, in general, looking after her. (*Id.* at 28.) No lifting was involved. (*Id.* at 29.) In September 2005, he worked at a public auction and drove automobiles. (*Id.* at 30.)

Porcelli received mental health treatment for depression during 2002 to 2006 at the Newark Community Mental Health Center. (*Id.* at 39.) He takes Lithium Carbonate, Trazodone, and Prozac which helps his condition, with constipation as the only side effect. (*Id.* at 39, 41.) At times, he has difficulty sleeping. He testified that he has manic episodes once or twice per year, but he has not been hospitalized for mental health treatment since 1997. (*Id.* at 40-41.)

During the alleged onset date to the date last insured, Porcelli was able to take care of his personal hygiene, get dressed, make meals, do general housekeeping, tend a small garden, and mow the lawn using a riding lawnmower. (*Id.* at 38, 44-45.) Porcelli is limited in his ability to walk in that he cannot walk every day, walks for only fifteen minutes, and cannot stand for more than half an hour. (*Id.* at 42.) He is able to climb stairs and does his laundry in the basement. (*Id.*) While his sitting is not limited, he is unable to sit in a hard chair for longer than thirty minutes. (*Id.* at 43.) He can lift twenty pounds. (*Id.*) He cannot bend forward too well, but he can kneel and bend his knees. (*Id.*) Porcelli keeps track of his own money, pays his bills, and buys and carries his groceries. (*Id.* at 45.) He has no problems with memory or concentration. (*Id.* at 43.)

### B. The Vocational Expert

Following Porcelli's testimony, the ALJ consulted the VE. The VE described Porcelli's

position at Chrysler as medium[1] and unskilled and the position as caretaker as light and semi-skilled. (*Id.* at 48.) The VE could not identify any skills that would transfer to a sedentary position.[2] (*Id.* at 49.)

The ALJ asked the VE to assume a hypothetical individual with Porcelli's age at onset (i.e., 45) with high school and college degrees, able to read, write and do at least simple math, at the medium level of work who should not climb ladders, ropes, or scaffolds, should avoid concentrated exposure to noise, background noise, hazards, and concentrated exposure to temperature extremes. (*Id.*) The VE testified that the hypothetical individual would be capable of performing Porcelli's past relevant work as a caretaker, but not the assembly position at the manufacturing plant. (*Id.*)

In addition, the VE testified that there were simple, unskilled jobs at the medium level as a stock clerk, light level[3] as a packer, and sedentary level as an assembler that the hypothetical

---

[1] "Medium work involves lifting no more than fifty pounds at a time with frequent lifting or carrying of objects weighing up to twenty-five pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work." 20 C.F.R. § 404.1567(c).

[2] "Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

[3] "Light work involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

8

individual would be capable of performing. (*Id.* at 49-50.) The ALJ added to the hypothetical that the person had a nondominant left hand and that handling, fingering, feeling would be frequent as opposed to constant. (*Id.* at 50.) The VE testified that the additional factors would eliminate the light and sedentary positions of packer and assembler, but the person could perform the light level position of unarmed security guard and the sedentary position of sedentary security guard and there were positions locally and nationally. (*Id.*)

## V. Standard of Review

The Court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence." *See* 42 U.S.C. § 405(g). Substantial evidence does not mean a large or a considerable amount of evidence. *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Rather, it has been defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate." *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

Credibility determinations are the province of the ALJ, and should be disturbed on review only if they are not supported by substantial evidence. *Pysher v. Apfel*, 2001 WL 793305, at *2 (E.D. Pa. July 11, 2001) (citing *Van Horn v. Schweiker*, 717 F.2d 871, 973 (3d Cir. 1983)). Thus, the inquiry is not whether the Court would have made the same determination, but rather, whether the Commissioner's conclusion was reasonable. *See Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). In social security cases, the substantial evidence standard applies to motions for summary judgment brought pursuant to Fed. R. Civ. P. 56(c). *See Woody v. Secretary of the Dep't of Health & Human Serv.*, 859 F.2d 1156, 1159 (3d Cir. 1988).

9

## VI. Regulatory Framework

Within the meaning of social security law, a "disability" is defined for purposes of DIB as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death, or which has lasted or can be expected to last, for a continuous period of not less than 12 months. *See* 42 U.S.C. § 423(d)(1)(A). To be found disabled, an individual must have a "severe impairment" which precludes the individual from performing previous work or any other "substantial gainful activity which exists in the national economy." *See* 20 C.F.R. § 404.1505. The claimant bears the initial burden of proving disability. *See* 20 C.F.R. § 404.1512(a); *Podeworny v. Harris*, 745 F.2d 210, 217 (3d Cir. 1984). To qualify for disability insurance benefits, the claimant must establish that he was disabled prior to the date he was last insured. *See* 20 C.F.R. § 404.131; *Matullo v. Bowen*, 926 F.2d 240, 244 (3d Cir. 1990).

To determine disability, the Commissioner uses a five-step sequential analysis. *See* 20 C.F.R. § 404.1520; *Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999). "The claimant bears the burden of proof at steps one through four, and the Commissioner bears the burden of proof at step five." *Smith v. Commissioner of Soc. Sec.*, 631 F.3d 632, 634 (3d Cir. 2010). If a finding of disability or non-disability can be made at any point in the sequential process, the Commissioner will not review the claim further. *See* 20 C.F.R. § 404.1520(a)(4). At step one, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity. *See* 20 C.F.R. § 404.1520(a)(4)(i) (mandating a finding of non-disability when claimant is engaged in substantial gainful activity). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from

10

a severe impairment or a combination of impairments that is severe. *See* 20 C.F.R. § 404.1520(a)(4)(ii) (requiring finding of not disabled when claimant's impairments are not severe). If claimant's impairments are severe, at step three the Commissioner, compares the claimant's impairments to a list of impairments (the "listing") that are presumed severe enough to preclude any gainful work.[4] *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent matches an impairment in the listing, the claimant is presumed disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five. *See* 20 C.F.R. § 404.1520(d).[5]

At step four, the Commissioner determines whether the claimant retains the RFC to perform his past relevant work. *See* 20 C.F.R. § 404.1520(a)(4 )(iv) (stating a claimant is not disabled if able to return to past relevant work). "The claimant bears the burden of demonstrating an inability to return to [his] past relevant work." *Plummer*, 186 F.3d at 428. If the claimant is unable to return to his past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude him from adjusting to any other available work. *See* 20 C.F.R. § 404.1520(g) (mandating that a claimant is not disabled if the claimant can adjust to other work); *Plummer*, 186 F.3d at 428. As previously stated, at this last step the burden is on the Commissioner to show that the claimant is capable of performing other

---

[4]Additionally, at steps two and three, claimant's impairments must meet the duration requirement of twelve months. *See* 20 C.F.R. § 404.1520(a)(4)(ii-iii).

[5]Prior to step four, the Commissioner must assess the claimant's RFC. *See* 20 C.F.R. § 404.1520(a)(4). A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment[s]." *Fargnoli v. Massanari*, 247 F.3d 34, 40 (3d Cir. 2001) (quoting *Burnett v. Commissioner of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000)).

available work before denying disability benefits. *See Plummer*, 186 F.3d at 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with his medical impairments, age, education, past work experience, and [RFC.]" *Id.* This determination requires the Commissioner to consider the cumulative effect of the claimant's impairments and a vocational expert is often consulted.

At step one, the ALJ found that Porcelli met the insured status requirements of the Social Security Act through June 30, 2006, and that he had not engaged in substantial gainful activity from the alleged onset date of January 1, 2002 through the date he was last insured on June 30, 2006. At step two, the ALJ found that Porcelli has the severe impairments of back pain and hearing loss. At step three, the ALJ determined that Porcelli's impairment did not meet or medically equal the listing criteria. At step four, the ALJ determined that Porcelli could perform his past relevant work as a caretaker. The ALJ concluded that Porcelli was not under a disability, as defined by the Social Security Act, from the alleged onset date of January 1, 2002, through June 30, 2006, the date he was last insured.

## VII. Whether the ALJ's Decision is Supported by Substantial Evidence

Porcelli objects to the Commissioner's determination that he is not disabled.[6] The Commissioner contends that the ALJ's decision is supported by substantial evidence.

The Court is not "empowered to weigh the evidence or substitute its conclusions for those of the [ALJ]." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992). The ALJ's decision

---

[6]Porcelli's brief mainly discusses his displeasure with the legal representation he received.

can only be overturned if it is found that the ALJ was unreasonable in her review of the evidence. An ALJ's decision must be accompanied by a clear and satisfactory explanation of the basis on which it rests in order for the court to properly decide whether the ALJ's decision is based upon substantial evidence. *See Cotter v. Harris*, 642 F.2d 700, 704-05 (3d Cir. 1981).

The ALJ's finding that Porcelli could perform his past relevant work as a caretaker is supported by substantial evidence. The record contains few objective findings from Porcelli's treating physicians relative to his complaints of back pain, and there is little evidence of treatment for Porcelli's back condition during the relevant time period. In August 2001, Porcelli's range of motion and gait were normal. In June 2002, Porcelli was medically cleared to join a gym with no restrictions. As of September 2006 his lumbar sprain was deemed stable. Notably, two state agency physicians found that there was insufficient evidence to determine that Porcelli had a medically determinable physical impairment prior to his date last insured.

In addition, Porcelli was able to work until 2002 and, it appears, only stopped working as a caretaker because of his mother's death. Despite his back condition, Porcelli successfully engages in the activities of daily living. In addition, he goes shopping, drives a car, rides a scooter, gardens, and repairs vehicles. Finally, the VE testified that a hypothetical person with Porcelli's limitations would be capable of performing his past relevant work as a caretaker.

The Court therefore concludes that the ALJ's determination, that Porcelli could perform his past relevant work as a caretaker, and that he was not under a disability, as defined by the Social Security Act, from the alleged onset date of January 1, 2002, through June 30, 2006, the date he was last insured, is supported by substantial evidence.

13

## VIII. CONCLUSION

For the aforementioned reasons, the decision of the ALJ is affirmed. Porcelli's motion for summary judgment (D.I. 14) is DENIED and the Commissioner's cross-motion for summary judgment (D.I. 15) is GRANTED.